In re ROCHESTER SHIPBUILDING CORPORATION.

No. 29275.

District Court, W. D. New York.

March 13, 1940.

Sutherland & Sutherland, and Andrew R. Sutherland, all of Rochester, N. Y., for Petroleum Heat & Power Co.

Harris, Beach, Folger, Bacon & Keating and Keith D. Poland, all of Rochester, N. Y., for American Locomotive Co.

Goodwin, Nixon, Hargrave, Middleton & Devans and W. Clyde O'Brien, all of Rochester, N. Y., for Lincoln-Alliance Bank & Trust Co.

Marvin R. Dye, of Rochester, N. Y., trustee in pro. per.

Charles Van Voorhis, of Rochester, N. Y., for trustee.

BURKE, District Judge.

The trustee has under his control as one of the assets of the debtor corporation a Deisel powered motor vessel called Dolomite #2. When the trustee was appointed the vessel was subject to a charter agreement dated October 23rd, 1936, which obligated the debtor corporation to transport petroleum products of Petroleum Heat and Power Company, hereinafter called Petro, from Gulf ports to points north of Hatteras at a stipulated rate of 25¢ per barrel. By this proceeding the trustee seeks to have a determination by the Court (1) that the charter should be deemed cancelled and terminated by its terms, (2) in the event that the said charter is deemed not to have expired according to its terms that the Court approve the recommendation of the trustee to reject it and to authorize and direct the trustee to operate the said vessel free and clear of any charter provisions.

The Lincoln Alliance Bank & Trust Co. holds a first preferred ship's mortgage on the vessel. It opposes cancellation of the charter on the ground that cancellation would deprive it of part of its agreed security. Its contention is based on one of the provisions of a financial agreement between the various corporations which were interested in the reconstruction and financing of the vessel. The bank had advanced moneys for the reconstruction of the vessel, repayment of which had been guaranteed by Petro. The financial agreement provided that "to the extent that Petro shall be indebted to Rochester (the debtor corporation) on any mortgage payment date for charter hire of Dolomite #2 or otherwise, Petro shall have the right to pay over to the bank direct, for Rochester's account, an amount up to but not exceeding the amount due as of such date from Rochester to the note holders under said mortgage obligation as hereinabove designed, and such payment by Petro to the bank for Rochester's account shall be pro tanto, a payment by Petro to Rochester". Petro is not indebted to the debtor corporation for charter hire or otherwise. The charter is not part of the mortgage security.

The charter agreement was made on October 23rd, 1936. The vessel was an old hull. It was to be substantially reconstructed, new engines installed and when reconstructed it was to be placed at the disposition of Petro for carrying its cargo. Petro was to guarantee the repayment of moneys advanced by the bank for the reconstruction of the vessel. As appears by the charter agreement the plan was that the vessel would be ready for enrollment on April 30, 1937. Because of conflicting provisions of the charter agreement relating to the original period and renewal period the duration of the charter is somewhat obscure. As it developed the vessel was not ready for enrollment until about December 1st, 1937. The charter agreement in the first paragraph thereof provides for a charter to Petro "as and when its reconstruction is completed for a period of three years from date of enrollment". Another provision is "It is understood and agreed that Petro shall have an option to renew this charter contract for a period of three years beginning December 1, 1939 under the same terms and conditions". Another provision is "If Dolomite (debtor's predecessor) receives an offer of purchase of said vessel during the three year term of the charter agreement or its renewal on December 1, 1939, Dolomite will pay to Petro the sum of 5% of sale price of said vessel". The trustee contends that by its terms the charter agreement ter-

minated on December 1, 1939. Concededly there has been no renewal nor any attempt to renew. Petro contends that the original charter period was a full three year term from the enrollment of the vessel on or about December 1, 1937 which would make the expiration date December 1, 1940. Its contention is that the date, December 1, 1939, in the charter agreement relates only to the right to renewal, which may be exercised after that date. In my opinion the evidence fairly establishes that the charter agreement contemplated a full three year charter period commencing at the enrollment of the vessel. Accordingly the charter agreement would not expire by its terms until December 1, 1940.

We come now to the question of whether the trustee at this time has the right to cancel the charter agreement. The trustee was appointed on April 17, 1939. The last cargo carried for Petro under the charter prior to the filing of the petition for reorganization was in the early part of February 1939. Thereafter and prior to the filing of the petition the vessel was otherwise engaged. Current freight rates at that time were substantially less than the charter rates. Shortly after his appointment the trustee determined that the operations of the vessel could be more profitably conducted in the Great Lakes. A charter covering Great Lakes shipping for the season of 1939 was made pursuant to an order of this Court, by and with consent of Petro. At the closing of the Great Lakes season the vessel proceeded to New York Harbor. The vessel was reconverted for coastwise classification and started on a southbound voyage on December 14, 1939.

While still on the Great Lakes, negotiations were pending between the trustee and one Johnson, Petro's representative, who had been named by the Court in the order appointing the trustee as an authorized advisory agent whom the trustee might engage on matters affecting the operation of the vessel. It was then orally agreed between the trustee and Johnson that the vessel should carry for Petro its petroleum products for one ocean voyage northbound on a spot cargo basis at the charter price of 25¢ per barrel. At the time this arrangement was made with Petro the current rates for north bound cargoes were between 26¢ and 30¢ per barrel. One of the reasons which prompted the trustee to move the vessel back to coastwise trade after its Great Lakes operation was the desire to sell the vessel. It was believed that a better market was available in salt water. In order to preserve the right to sell the vessel at any time a sales clause in any charter made was necessary. With a sales clause long term charters were impossible to secure. It was therefore determined that the best course was to arrange for one voyage on a spot cargo basis and await developments. This voyage started on December 14, 1939 and was completed January 18, 1940, at Newark, New Jersey. Immediately prior to the commencement of this voyage the trustee, with Petro's approval, granted to ships brokers the privilege of selling the vessel at a price of $260,000 subject to existing charters. An offer of purchase was made, conditioned however on inspection of the vessel. On inspection it was withdrawn. Shortly thereafter this application was made.

■■ The charter was never expressly adopted by the trustee. It has not been adopted by implication merely because it was not disaffirmed within the time limit fixed by the Court. The Court is not precluded by its own general order fixing the time within which to cancel executory contracts from entertaining an application to cancel after that date if special circumstances warrant. Consolidated · Gas Electric Light & Power Co. v. United Railroads, 4 Cir., 85 F.2d 799. Although the trustee took possession in April 1939 and took no steps to cancel the charter until January 1940, it cannot be said that he had all that time to determine whether it was for the best interests of the creditors to reject the charter. It had been suspended with Petro's consent most of that time for operation on the Great Lakes. Not until December did the trustee have an opportunity to determine in salt water whether the charter was a good asset. One voyage determined that it was not. Current freight rates were almost three times the price fixed by the charter. He had the right to experiment by making one voyage for Petro without becoming bound by the terms of the charter. Pacific Western Oil Co. v. McDuffie, 9 Cir., 69 F.2d 208, 213; Butterworth v. Degnon Contracting Co., 2 Cir., 214 F. 772; Menke v. Willcox, D.C., 275 F. 57.

■■■ It is claimed that the trustee is estopped by his conduct from rejecting the charter agreement at this time. This implies that Petro relied on such conduct in concluding that the trustee was adopting

the charter agreement, and charted its course accordingly. It must be remembered that Petro was in more or less close contact with the trustee throughout this whole period of administration. The trustee was authorized by the Court to engage Johnson as advisory agent in the operation of the vessel. This provision was made at the suggestion of Petro, prompted no doubt by its large financial interest and its potential liability to the bank on its guarantee of repayment of funds advanced by the bank. Petro favored the plan to sell the vessel. A sale would have protected it against liability on its guaranty. It wanted the charter continued also because it could at the same time collect 5% of the sale price. Instead of frankly discussing with the trustee the question of whether he should adopt the charter, it chose to rely on the conduct of the trustee as binding him to adoption. The trustee does not become bound by an executory contract until he indicates his intention to adopt it. Pacific Western Oil Co. v. McDuffie, supra; Menke v. Willcox, supra. Under the circumstances and considering the relationship here in the operation of the vessel between the trustee and Johnson acting in Petro's behalf there is no ground for the claim of estoppel.

The application to reject the contract is granted.